The Honorable, the Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable, the United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention, for the Court is now sitting. God save the United States and this Honorable Court. Please be seated. Welcome to the Fourth Circuit. And we'll hear argument in our first case, Yearly Meeting of the Religious Society of Friends v. Department of Homeland Security. Mr. Talent, we'll be glad to hear from you. Thank you, Your Honor. Good morning, and may it please the Court, Michael Talent for the federal appellants. Appellees are a group of religious organizations who have sued the federal government over the Department of Homeland Security's decision to alter who approves immigration enforcement actions at houses of worship. Well, let me confirm just as we start. The preliminary injunction on what we're talking about today only concerns places of worship. Yes, Your Honor. Nothing else. No other sensitive locations. Right. And even with the injunction, you can still go in with a warrant. With an administrative warrant, yes, Your Honor. Or a judicial warrant. Or a judicial warrant, yes, Your Honor. All right. This internal guidance does not change the legal authorities permitting the Department of Homeland Security to engage in enforcement actions at houses of worship. It does not specifically target houses of worship. And it does not claim to relieve the agency or its personnel of their obligation to comply with RFRA and the First Amendment when conducting an enforcement operation. Well, let me cut to the chase as I see it here, particularly on RFRA. So if we look at pages 311, 312, 313, and 314 of the appendix, you have the district court's opinion dealing with RFRA. And it addresses a substantial burden and goes through the various plaintiffs and what the court sees based on their evidence as a substantial burden. It's my understanding from the record that the government made no evidentiary representations. No evidentiary representations about whether they have a sincere religious belief or I guess what we didn't put in. To my knowledge, we didn't challenge any of their claims about it. So all the district court had to go on in making its substantial burden analysis is what the parties represented. And you had zero, and the various plaintiffs had a number of declarations that stated their rationale. And then the district court went on for the other part of the test, which was to analyze based on the burden, the compelling interest, and least restrictive means. And it's my understanding from the record that the government made no argument as to what the compelling interest was. So we argued that you can't – the compelling interest test doesn't really make sense when you're simply challenging who can approve an enforcement action. But if it did, you didn't tell the district court what that compelling interest was. So if this is – if Your Honor is getting into waiver, two answers to that. One, this court does have discretion to address the issue. The district court rejected our view that because this is simply about who can approve an enforcement action, that the tailoring analysis doesn't really work, doesn't really make sense. And so what we're doing in our briefs here is we're explaining to the court why that's wrong. I do think at the end of the day what we're really talking about here is it gets all the way back to standing because who approves an action doesn't lead to – doesn't lead to, doesn't suggest that the Department of Homeland Security is about to engage imminently in any enforcement actions at any of the plaintiff's churches. Right, but they've all made statements that we're injured, it affects our communal worship, we're making less money. And in response, the government doesn't offer anything to contradict that. And then the court goes on to do its analysis on, well, what are the compelling government interests? And it doesn't get anything from the government. So it looks like to me it's a very difficult case for you to prevail on if you don't present any evidence and you don't argue the legal principles. Well, we did argue the legal principles, Your Honor. Well, you said the compelling interest doesn't apply. But if it does, you never told the court what they were. Well, I think – so if we step back, I think the arguments as to legal principles, as to standing, that is obviously plaintiff's burden to carry. So we prevail on standing without having to put any evidence in the record. And so as to their evidence about people not attending worship, this reduction in attendance of you, they still have to establish – they still have to prove up the elements of standing. And as we point out in our brief here, they didn't do that. Their claims of standing, what the district court relied on, is simply an assertion that people aren't attending worship services or going to these houses of worship because of this new DHS policy. But as we point out, there's a lot of other evidence, specific evidence in the record, that people aren't leaving their homes because of the broader immigration enforcement policy. I thought their congregants told them they're not coming to services because of the change in policy. So two, I think, factual points to that, why that's insufficient. One, there is evidence in the record, again, that people are not – people are responding more broadly to the immigration enforcement priorities. But they have specific congregants saying to them, I'm not coming, and the reason I'm not coming is because of the change in policy. Why does it matter what other people are doing? Because under Clapper footnote 7, they still have to show that the – and this gets to my second point, but they still have to show that the congregants are reacting in predictable ways to the specific change in policy, to who is approving and enforcing. It seems pretty predictable. Well, they have some declarations that say that. And again, I don't mean to carry this to another necessary extreme, but you would have expected the government to put on something, a declaration from somebody that would challenge the accuracy of the declarations from the plaintiffs. And the government didn't do anything. Well, Your Honor, I think – And it's very hard to win a case without evidence or legal argument. Well, I think it's – there is evidence in the record. We have the Huffman Memorandum. The Huffman Memorandum doesn't target any particular church, doesn't say – doesn't create new legal authorities. To your question, Judge Harris, about what the congregants said and what was put into the record, the congregants seem to believe, and we point this out, that the prior policy created the safe haven that prevented enforcement at churches overall. This argument that the congregants have misunderstood the new policy and how it affects their legal risk, I mean, that is exactly the argument that the Supreme Court rejected in the Department of Commerce versus New York case where the government again argued, look, these immigrants have an unfounded fear about what will happen if they answer the census questions. And it was actually a pretty good argument in that case because the law prohibited the government from using those answers. And the Supreme Court was like, it doesn't matter. Unfounded, founded, it's predictable that people will respond this way. And I just don't see how it is not predictable that if DHS makes a public statement saying, thanks to this new policy, you illegal immigrants can no longer hide in churches, that people are going to avoid churches. So in the Department of Commerce case, there was a trial and there was significant historical evidence regarding response rates to surveys from the Census Bureau. And that showed that inclusion of a question like that would lower response rates. And here we have declarations from these churches saying we have already experienced a reduction in attendance and our congregants tell us it's because of the policy. But the evidence here, the statement simply, well, we think it's because of the policy, stems from a fear of future enforcement actions at the house. But they didn't say in their affidavits, we think it's because. They said it is because. But regardless, they still need to show it's because of this policy, which changes the approval levels, who approves an immigration enforcement action at the church. An immigration enforcement action at any one of these houses of worship was allowable under the Mayorkas Memorandum and the existing legal authorities. So there's nothing, so the problem, the reason why we point to this misunderstanding, Your Honors, is because the Huffman Memorandum simply changes who can approve an enforcement action. It's not what the Huffman Memo says. The Huffman Memo says it's getting rid of bright line restrictions on enforcement actions. The Huffman Memo at least thinks this is a pretty big change. Well, it may be a big change in who approves an enforcement action, but it doesn't target it. What are the bright line rules it was talking about? Well, the bright line rules was that headquarters under the Mayorkas Memorandum had to approve an enforcement action. It wasn't an example where the Huffman Memorandum doesn't say go forth and target churches. It doesn't say you can, we are going to create new authority to target churches. The Department of Homeland Security still has to exercise existing legal authorities subject to existing legal restraints such as RFRA, such as the First Amendment and other existing legal obligations. This makes it a pretty prototypical Clapper fact pattern because what the plaintiffs have come here and said is, well, the Department of Homeland Security in the future may engage in an enforcement action, and if they do, bad things will happen to us. Well, that's not imminent. That's not sufficient to show imminence under Clapper. Then they try and turn it into a present-day injury by saying, well, our congregants aren't coming to church now because of this policy. But they don't disentangle what the policy does, which is change the level of approvals, from the broader immigration enforcement context, and they don't grapple with the fact that the Mayorkas. So both the Huffman Memoranda and general fear of enforcement are both accurate. I mean, are they somehow mutually exclusive? Well, they're not mutually exclusive, but they're not challenging any authority the Department of Homeland Security has to engage in actual enforcement at churches, and they haven't shown that under the Mayorkas Memorandum the type of enforcement they're concerned about could be done under this administration's existing policy. I mean, kind of maybe the counterfactual is what if this policy had existed under an administration that said we're not going to enforce the immigration law as aggressively as this administration? In that case, I think that their congregants wouldn't have the same type of concern about ICE raids or CBP raids, and they would be going out to churches. They would be going out to their community. The record is very specific that there's evidence that they're concerned about broader immigration enforcement writ large, and that's why they're staying home. And you compare that with the fact that all the Huffman Memorandum did was change the level of approval. Why don't we just assume for purposes of argument under RFRA that there is a substantial burden? Why don't you tell us now what the compelling government interest is and why we should recognize any of that in view of your argument in the trial court? Well, to your second point, I'll just reiterate, you can exercise your discretion because we've presented argument about why the trial court's analysis is wrong.  Sorry. Why should we do that? I mean, how difficult was it to tell the district court, well, we have a compelling government interest in this circumstance, and here's what it is? Well, I think the logic of it is when the challenge is to who approves an enforcement action, that is very hard, I think, to concept. Most tailoring analysis deal with direct regulation, something telling a party what to do. And so most of these challenges, a challenge to who is approving an enforcement action, I think is pretty clearly going to get nixed at the standing stage. Let me go back to a more basic question. I mean, why didn't the government, as an alternative argument, even if you thought this was not an appropriate time to discuss compelling interest, why, as an alternate argument, you didn't say, well, if it is, here's the interest? I'm just at a loss to understand the government's litigation position in the district court. Your Honor, I cannot, unfortunately, speak to trial strategy. I think at the end of the day what we're ñ compelling interest, this test overall. I've mentioned Clapper. I think we're really getting ñ I mean, it's hard to conceptualize how to do that, partly because there's not really a meaningful judicial standard to apply in determining whether the executive has engaged in a proper tailoring decision as to what level of approval a particular enforcement action is going to get. That's why we bring up United States v. Texas in talking about standing. Counsel, can I ask you a question about the waiver? Because you say we can just exercise our discretion to forgive it, but this is an unusual case where, I mean, it was ñ it's not as though the government just forfeited an argument. The government sort of refused to make an argument while the district court was asking for it. So the district court had an opportunity to react to the waiver, and the district court said, I'm holding this waiver against you. Because you haven't made an argument, I can't rule against the plaintiffs on likelihood of success under compelling interest. So I feel that to reach the argument now, we would almost have to say the district court was wrong. It abused its discretion in holding the government to its waiver. And how could I say that? Why would that be an abuse of discretion to tell the government, look, make the argument or don't make the argument, but if you don't make it, I'm holding that against you. I'm deciding this issue on waiver grounds. I think by acknowledging that this court has discretion to reach it, you could ñ Those cases are different. Those are cases where someone has forfeited an argument. The district court never had occasion to pass on it because it was never made in front of the district court. And then we say, we won't hold that forfeiture against you. And we're not ñ that's not contrary to anything that the district court did. I really am troubled by the idea that here the district court invited you to make the argument. When you refused to do it, made what I think of as a kind of heartland discretionary decision to hold that waiver against the government. And now you're asking us to reverse that decision. Well, I don't want to press too hard on the court's exercise of discretion because I think all the compelling interest arguments that we point out in our brief are equally applicable at the threshold stages of justiciability and the substantial burden test because they all show that this is a ñ the question here is, can the plaintiffs challenge the executive's decision that someone else is going to approve an enforcement action? That's a standing issue. I don't understand how that connects to compelling interest. Well, it's a similar type of argument. The compelling interest argument we make in our brief, we point out, is we have ñ the government has a compelling interest in immigration enforcement and in ordering its discretionary decisions about who approves an enforcement decision in a way that it views as mostÖ I'm not going through at the 30,000-foot level, but here we're talking about a specific topic. Churches. What's the compelling interest that you represent today for churches? It is what we put into the brief, Your Honor. It's the executive has a compelling interest in enforcing the law and in ensuring that the discretion, you know, setting who can decide it. Just one follow-up question on the compelling interest issue. So my concern is that the reason you didn't want to argue compelling interest in the district court is because it is kind of contrary to the through-line of your whole argument, that there's really no difference. This is just such a minor thing about what level the approval is, like it wouldn't have any effect in the real world, but then you have to turn around and argue, oh, no, we have a compelling interest in the difference between the old level of approval and the new level of approval. It actually makes an enormous difference to us, and that's why I think you didn't want to argue it. I'm surprised to hear you say that your compelling interest argument is the same as your standing argument because, from what I can tell, they're diametrically opposed. So I don't want toóif I represent the same, that's not what I wanted to represent. I wanted to represent that there is a similarity in them, or there's not a tension in them, and I'll just be real quick because I see I'm in my rebuttal time. First, because it illustrates the difficulty of establishingó of showing how the courts can employ meaningful standards to measure the executive's exercise of discretion to determine who would engageówho would approve an enforcement action. And that's one of the factors in United States v. Texas that led the court to conclude there was no justiciability there. And then more broadly, I think it showedóto your pointó there's no tension in the change because even though the new policy makes enforcement of the immigration laws more effective, it is still plaintiff's burden under Clapper to show that an enforcement action is imminent to establish that it's not speculative and not hypothetical, and that's what they need to show traceability even for third parties. All right. Thank you very much. You've got some rebuttal time, Mr. Girard. Good morning, Your Honors, and may it please the Court. Bradley Girard on behalf of the Plaintiff Appellee Houses of Worship. DHS's new policy is that the First Amendment and RFRA provide houses of worship no more protection from government intrusion than any other public space. That policy is a dramatic departure from the policy of the last 30 years. Plaintiff congregants understood that, and why wouldn't they? You agree. We're only talking about places of worship today? Yes, Your Honor. And if they've got a warrant, they can go in? Yes, Your Honor. In publicizing the new policy, DHS said that the former policy tied the hands of its agents, and it said that criminals would no longer be able to hide in America's schools and churches. Likewise, DHS has told this Court that the former policy was unduly restrictive and far less timely and effective. But now DHS insists that the new policy is a minimal change and that it's purely internal guidance about who approves immigration enforcement. DHS's argument turns on that insistence, but that is irrelevant and wrong. I'll start with why that's irrelevant. The plaintiffs challenged the new policy, and the new policy says that immigration enforcement can happen at houses of worship based on nothing more than an agent's common sense. There are no guardrails other than that. And understandably, when that policy was announced, the plaintiffs' congregants heard that, understood that their houses of worship were no longer safe spaces, and many people stopped attending. That is a substantial burden under RFRA. I'm happy to talk about the substantial burden. I do want to say that in terms of the waiver point, not only did the government waive the argument under both expressive association and under RFRA, but even if the government didn't waive it, even if the court were to excuse that waiver, the argument the government makes now is at such a high level, the government interest is interest in enforcement of immigration laws generally, but both the exacting scrutiny test and strict scrutiny require a more exacting explanation of the government's interests. And so the government has to show why it has an interest in enforcing immigration law at houses of worship, again, based on nothing other than agents' common sense. And it hasn't provided any evidence of that, hasn't provided any argument for that, even in this court, but certainly nothing to substantiate that in the district court. There are a few points about standing that I want to make just in response to what DHS argued today. I think our brief goes through... And you would agree that we could proceed under either First Amendment or RFRA. It's not necessary to address both. Yes, Your Honor, I agree with that. I think that's enough to hold that the district court did not abuse its discretion and to affirm the decision for the preliminary injunction. On RFRA, can I just ask you to define for me how would you characterize the substantial burden in this case? The substantial burden in this case is the deterrence of congregants to go for communal worship, which is central to the religious practice of all of the plaintiffs. It is the deterrence from people to go to ministry, which is, again, an incredibly important part of the religious exercise of all of the plaintiffs. There are a number of other attendant harms that come from that. It's the loss of money from people not being there. It's the loss of volunteers. It is the, um... It's the reduced experience for one who's in worship. I don't want to just describe reduction in attendance at kind of a high level. I think if you think about what it means for somebody to be in worship for the Quakers, it is literally losing opportunities to hear the voice of God. For the cooperative Baptists, you know, there's... Reduced people in the pews makes the experience of hymns and group prayer different. For the Sikhs, the inability to really do the lunger and to serve the community. These are all really core parts of their religious practice. So as I read the district court opinion, I thought the district court identified two substantial burdens, and one is the one you were just describing. And then I thought the district court was also finding that enforcement actions themselves would constitute a substantial burden, and I think particularly with respect to the Quakers because of their pacifist beliefs. But I actually don't understand you to be relying on that burden in your brief for today. You're focused on the reduction in the congregation. I think we do mention that in our brief, and we think that that's also right, and that's a substantial burden. There were also a host of other substantial burdens that we argued in the district court that we didn't raise in the brief because they weren't what the court relied on, and that's the conscience injuries, the kind of Hobson's choice. But we do defend it. We think that's another substantial burden, and we think the court was correct in finding that even the specter, as some of the Quaker declarants said, even the specter of this armed immigration enforcement... But you only need one. But we only need one, and we think that the reduction in attendance and, again, everything that flows from that is more than sufficient. I think that's probably the cleanest way, and, you know, courts for years have recognized the harms that come to houses of worship when there's a reduction in attendance. I'm happy to talk about expressive association as well if the court has no further questions on our RFRA claim. I think, as I said before, the court doesn't need to reach both of these grounds. One is enough to affirm the district court's preliminary injunction, but to the extent that it wants to. The standard is not a substantial burden standard. It's a lower standard, and that's whether the government action significantly affects the right to gather for worship. And I think for all the reasons that I just explained, and especially against the backdrop of what the Supreme Court has said time and again, including just last week in Davenport, that the right to expressive association protects against not only heavy-handed frontal attacks, but also the more backhanded type of interference with expressive association rights. And so I think for the reasons that I just stated under RFRA, we've satisfied the significantly affects test, and for the same reasons that the government fails under strict scrutiny, it can't satisfy exacting scrutiny under expressive association. I don't want to just march through the brief. I think all of the points that we need to make, we've made in the brief. If you have questions, I'm happy to continue, but I don't want to stand up here just to take the court's time. Thank you very much. Thank you. Mr. Talen, you've got some rebuttal time left. Thank you. Three points, roughly, for rebuttal. Opposing counsel pointed out that his RFRA burdens, or he's relying very significantly on this idea that the substantial burden in the RFRA context is a deterrence to congregants to attend church. Again, I think I want to emphasize that the deterrence only turns firstly on the potential for a future enforcement action at any one of these houses of worship. That is a very classic Clapper scenario, and they have to show, therefore, that an enforcement action is imminent to render that fear non-hypothetical, non-speculative, and that includes for third parties under Clapper footnote 7. Can I just ask you a question? I'm sorry. No, go ahead, Judge Kagan. So you're saying that the declarations themselves in the affidavits mean nothing? I think they... I think what we... You're asking us to disregard the evidence that was before the district court, aren't you? We are saying that they have... They admit that the congregants are third parties, and they have to show that the third parties are not... are responding to the actual change in who approves an enforcement action. Right, and they said they were. They said they were... Well, so they, as we point out, that's a very conclusory statement, and doesn't carry their burden under cases like Clapper, under cases like Murphy v. Missouri, where we have the more aggressive enforcement posture by this administration. So that is causing people not to go out to church, not to stand up. Well, at a preliminary injunction hearing, what is it that you say they should have produced that they didn't, keeping in mind the government didn't produce anything? Well, they needed to show... They needed to show that the congregants were not engaging in... not staying home as a result of a subjective fear that there would be an enforcement action at their churches. Footnote 7 of Clapper... How is that different from the census question case? That's exactly what the government said there. These immigrants may not be answering the question, but that is for unfounded legal fears. Those fears are unfounded, and the Supreme Court said we don't care. If it's predictable that they will respond that way, that's good enough. Because there was evidence showing that when the question was included in a survey, response rates went down in the Department of Commerce. And here there is evidence showing that the congregations have already gotten smaller. The evidence is a statement that the plaintiffs made in Clapper. The plaintiffs in Clapper, this is in footnote 7, said people are disinclined to talk to us because they are concerned the government will intercept their communications. How is this a Clapper case? This is not a case about whether the congregants have standing. This is a case about whether the churches have standing. They are not here on an associational standing. Which rely on the actions of congregants in response to the Department of Homeland Security, and they need to show predictable effects. But if it's not a Clapper case, then it's a Hippocratic Medicine case. Because what they're saying is the predictable effects of a government policy, the downstream predictable ripple effects of a government policy establish standing. Hippocratic Medicine said that's too attenuated. That doesn't establish standing. Can I just ask you a very quick question about substantial burden? So I just want to make sure I understand the government's position on what counts as a substantial burden. The district court said that this policy effectively compels plaintiffs to engage in worship with smaller congregations and with fewer immigrants. That's what the district court found. Do you disagree with the factual premise of that holding or with the legal conclusion that if in fact the policy did that, it would be a substantial burden? Where do you jump off from that being a substantial burden? Well, we jump off because who approves an enforcement action as an internal government policy? This is not... So you think even if that were true, even if this policy effectively compelled the plaintiff churches to engage in worship with a smaller congregation, it still would not be a substantial burden? Well, I think what opposing counsel just said is it's the enforcement, it's the people showing up at churches as causing people not to attend. The policy doesn't do that. Would it be possible for you, just to answer the question, if in fact this policy effectively compels plaintiffs, the plaintiff churches to engage in worship with a smaller congregation, would that be a substantial burden? Not under the Huffman Memorandum because incidental effects of internal government action, even if it makes worship harder, and in Ling it would make, I think, worship impossible for the plaintiffs there, does not rise to the level of substantial burden because it's not coercive. Who approves an enforcement action is not coercive, and that's a test under Bowen v. Roy, under Liberty University, and just Judge Agee brought up warrants. I'd like to point out, and just kind of underscore our argument in the brief, that that undermines plaintiffs' redressability point. Why? Because they need to show that if their argument is the level of enforcement, the deterrent effect, I think is what my friend said, is what's keeping people from churches. The fact that they can't get relief on administrative warrants undermines their claim that there won't be an enforcement action at a church. Is there a difference between law enforcement proceeding under their view of common sense and proceeding under a warrant that's issued? I mean, that just seems like to be a basic societal difference, if there's a warrant that's issued. Our argument pairs a warrant with the fact that the Mayorkas Memorandum doesn't bar enforcement. It doesn't create this kind of safe harbor, safe haven from churches. Enforcement is possible under the Mayorkas Memorandum, which shows that, again, the concerns about immigration enforcement at these houses of worship is driven more probably by the overall enforcement posture of this administration, especially in light of the fact, as I pointed out, DHS is subject to existing authorities when it engages in the type of enforcement action at churches that we're talking about. So an actual person going to church would be subject to existing applicable law. And I see I'm out of my time. I'm happy to answer any other questions. All right. Thank you very much, Mr. Talent. We're going to come down and agree to cancel, and then we'll move on to our next case. All right. Please be seated, and if counsel for the next case will come on up.
judges: G. Steven Agee, Pamela A. Harris, Barbara Milano Keenan